**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** <br> **Plaintiff,** <br> **v.** <br> **KRISH KUMAR,** <br> **Defendant.** | ) | **Case No. 26-CV-0184-CVE-JFJ** |

**OPINION AND ORDER**

Before the Court is plaintiff Securities and Exchange Commission's (SEC) motion for remedies and entry of final judgment as to defendant Krish Kumar (Kumar). Dkt. # 12. On March 31, 2026, the Court entered an agreed judgment against Kumar, in which Kumar consented to the Court's jurisdiction over him and the subject matter of this action, consented to entry of judgment without admitting or denying the allegations of the complaint, waived findings of fact and conclusions of law, and waived any right to appeal from the Court's judgment. Dkt. # 9, at 1. The case arose from Kumar's actions undertaken while acting as an investment adviser to two investment funds, Future Fractal Investments LLC (FFI) and Arcane Resonance Fund, LLC (Arcane) (collectively, the Funds). Kumar was found to have violated the antifraud provisions of the Securities Act of 1933 (Securities Act), 15 U.S.C. § 77a et seq., § 77q(a), and the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. § 78a et seq., § 78j(b), as well as SEC Rule 10b-5, which was promulgated under § 10 of the Exchange Act (see 17 C.F.R. § 240.10b-5), and § 206(1), (2), and (4) of the Investment Advisers Act of 1940 (Advisers Act), 15 U.S.C. § 80b-1 et seq. In the Court's judgment, it ordered, adjudged, and decreed that Kumar "shall pay disgorgement of ill-gotten gains, pre-judgment interest thereon, and a civil penalty" pursuant to § 20(d) of the Securities Act

[15 U.S.C. § 77t(d)], § 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and § 209 of the Advisers Act [15 U.S.C. § 80b-9]. Dkt. # 9, at 6. At issue are (1) whether Kumar owes civil penalties, and if so, the amount of any penalties, based on any violations involving fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement that resulted in substantial losses to investors and (2) the amount owed by Kumar in disgorgement based on any ill-gotten gains.

**I.**

On March 26, 2026, the SEC filed the present case against Kumar (Dkt. # 2) and the next day, the SEC filed its agreed motion to enter bifurcated judgment, pursuant to a settlement between the SEC and Kumar. Dkt. # 3. In the unopposed motion for a bifurcated judgment, Kumar consented to the entry of the judgment, further agreeing that in connection with the SEC's motion for disgorgement and/or civil penalties, "(a) Defendant will be precluded from arguing that he did not violate the federal securities laws as alleged in the Complaint; (b) Defendant may not challenge the validity of this Consent or the Judgment; (c) solely for the purposes of such motion, the allegations of the Complaint shall be accepted as and deemed as true by the Court; and (d) the Court may determine the issues raised in the motion on the basis of affidavits, declarations, excerpts of sworn deposition or investigative testimony, and documentary evidence, without regard to the standards for summary judgment contained in Rule 56(c) of the Federal Rules of Civil Procedure." Dkt. # 3-1. The Court entered the unopposed bifurcated judgment on March 31, 2026. Dkt. # 9. The judgment ordered injunctive relief, as well as payment of disgorgement, pre-judgment interest, and a civil penalty, but left the amounts of monetary remedies to be resolved by the Court upon motion by the SEC. Id.

The following facts are taken from the SEC's complaint and accepted as and deemed true for the purposes of the present motion, consistent with the Court's judgment entered on March 31, 2026. Dkt. # 9, at 7. In his response to the SEC's motion for remedies and entry of final judgment (Dkt. # 21), Kumar challenges several facts as alleged in the complaint. In accordance with Kumar's consent to the bifurcated judgment (Dkt. # 3-1), the Court disregards any factual allegations now raised by Kumar that contradict or challenge the facts as alleged in the complaint. Among other issues, Kumar challenges the conclusion that he "misappropriated" the Funds' assets by transferring the assets to his personal account(s). In an email to the SEC, Kumar's counsel confirmed that Kumar consented to the entry of the bifurcated judgment but reserved the right to object to the characterization of Kumar's conduct in the complaint, including the characterization of Kumar's conduct as "misappropriation." Dkt. # 21-24. Kumar now describes the inclusion of "misappropriation" as a "revised, post-Consent characterization." Dkt. # 21, at 16. However, this argument holds little weight considering that Kumar reviewed and discussed the SEC's as-filed complaint with counsel and after doing so, Kumar confirmed through counsel that he did not oppose the motion for entry of a bifurcated judgment. Dkt. # 21-24. Only after receiving Kumar's consent based on the as-filed complaint did the SEC file its motion. Regardless, whether Kumar "misappropriated" investor funds is a legal conclusion in the Court's province. As agreed to by the parties, the Court will accept all factual conclusions as alleged in the complaint, but the Court will consider Kumar's legal arguments as to whether Kumar misappropriated investor funds for the purposes of deciding civil penalties and disgorgement.

From approximately January 2024 through February 2025, Kumar–a then-college student from Tulsa, Oklahoma–raised approximately $7.8 million through two investment funds that he

established and solely managed, FFI and Arcane, based on materially false and misleading representations. Dkt. # 2, at 1. Among other accomplishments, Kumar earned a near-perfect SAT score, was valedictorian of his high school class, and is a three-time state tennis champion. Id. at 6. While in college, Kumar interned for a private investment firm in Tulsa and a private equity firm in Chicago. Id.

On January 6, 2023, Kumar created FFI, which was his first investment fund. Id. At all times, Kumar was the only person associated with FFI, serving as its founder, sole managing member, and investment adviser. Id. Between January 26, 2024, and March 6, 2024, Kumar raised a total of approximately $6 million for FFI from thirteen investors based on oral and written misrepresentations,[1] including that (1) FFI would purchase only Index-Based ETF A and Index-Based ETF B options based on an algorithmic trading strategy that Kumar developed and back-tested; (2) no trade would exceed 5% of FFI's assets under management (AUM); and (3) there would be a maximum drawdown of 20% per trade. Id. at 7, 10; Dkt. # 21-3, at 3. Based on Kumar's misrepresentations, the investors sent their funds to bank and brokerage accounts held in FFI's name, which Kumar controlled. Dkt. # 2, at 7. Kumar knew all thirteen FFI investors through personal relationships or connections made by Kumar's former tennis coach. Dkt. #21-2, at 3.

Starting on January 30, 2024, which was FFI's second day of active trading, through the end of February 2024, Kumar traded FFI's assets contrary to the trading strategy he represented to

---

[1] The record contains FFI's written offering materials prepared by Kumar dated December 20, 2023, and December 27, 2023, respectively. Dkt. # 21-3; Dkt. # 21-4. The December 20 and December 27 offering materials are both titled "Fund Prospectus," and the SEC refers to these materials as FFI's "Prospectus" in its complaint. As Kumar points out in his brief, these offering materials related to a private offering; thus, neither document is a "prospectus." Dkt. # 21, at 11.

investors by trading in securities other than Index-Based ETF A and Index-Based ETF B. Dkt. # 2, at 11. In fact, Kumar never traded in Index-Based ETF A, and conducted only limited trading in Index-Based ETF B. Id.

Kumar contends that he had discretion under FFI's operating agreement (Dkt. # 21-5) to trade outside of Index-Based ETF A and Index-Based ETF B. Dkt. # 21, at 13. The thirteen FFI investors executed a joinder agreement, recognizing that their investment was subject to the terms of the operating agreement. Id. at 12. The operating agreement provides Kumar with "veto power over any and all decisions made by the company" and authority to trade on margin accounts without member approval. Dkt. #21-5, at 5, 10. The operating agreement also states that the members represent and warrant that: "they were not solicited for an investment opportunity"; they intend to enter FFI for "the purpose of developing proprietary trading strategies"; there were "no representations regarding projected returns or promises regarding any supposed investment returns"; and they understood that "the proprietary trading strategies developed by [FFI] may result in a loss, partial or complete, of their capital contributions." Id. at 15. Kumar's view is that FFI was a "learning opportunity" to develop his trading algorithm. Dkt. # 12-1, at 24.

On February 3, 2024, Kumar sent an email to over thirty existing and prospective FFI investors, in which he made false and misleading representations regarding FFI's initial returns. Dkt. # 2, at 12. In that email, Kumar falsely claimed that FFI generated a positive return of 15.7% in its first week of trading. Id. In reality, FFI had incurred losses of approximately $1,200 (0.09%) in its first week. Id. Kumar contends that he believed FFI had a positive return of 15.7% because he lacked the experience to take into account unrealized losses. Dkt. # 21, at 13. The SEC contends that Kumar knew, or was reckless in not knowing, that his February 3, 2024, representations

regarding FFI's initial returns were false and misleading. Dkt. # 2, at 12. In that email, Kumar also included a chart reflecting that FFI's first-week return was roughly fifteen times greater than the returns earned by other indices during the same time period. Id. The SEC argues that comparing FFI's performance to market indices was deceptive because it reinforced the false representation that FFI's trading strategy was limited to trades in Index-Based ETF A and Index-Based ETF B. Id. at 13. After sending this email, FFI received twelve new investments–all but two from new investors–which raised $4.7 million. Id.

Beginning in late February 2024 through early March 2024, after having incurred losses of approximately $470,000 from trades outside of the represented investment strategy, Kumar transferred over $5.6 million of FFI's assets to his personal accounts. Id. at 13. Kumar never disclosed to investors that he transferred FFI's assets from the FFI accounts to his personal accounts. Id. at 11. The SEC's complaint alleges that of the $5.6 million, Kumar transferred nearly $5.4 million to his personal brokerage account and $250,000 to a nominee brokerage account that he controlled and that was not in FFI's name. Id. at 3. However, the Court cannot find any evidence of the nominee brokerage account in the record. Additionally, although the SEC's complaint refers to bank and brokerage accounts of FFI, the SEC supplied only the records of one Morgan Stanley account in the name of "Future Fractal Investments LLC." See e.g., Dkt # 29-1, at 47 et seq.

Kumar transferred FFI's funds from the Morgan Stanley account(s) to a personal account at Charles Schwab. Dkt. # 21, at 13. Kumar contends that, when he opened the Charles Schwab account, he intended to open a business account for FFI but did not understand that the account had to be tied to FFI's Employer Identification Number (EIN) rather than his personal Social Security Number (SSN). Dkt. 21-2, at 6. Kumar adds that when this issue came to his attention in early

2025, he worked to reclassify the Charles Schwab account for tax purposes in order to issue his investors K-1s, and eventually succeeded in doing so after reaching out to the Internal Revenue Service. Id. Kumar states that he put FFI's name on the application for the Charles Schwab account. Dkt. # 21-2, at 6. However, the only evidence of the Charles Schwab account in the record are account statements provided by the SEC, which reflect that the Charles Schwab account was in Kumar's personal name (using his parent's home address) and nicknamed "Krish Trading." Dkt. 29-1, at 119. Kumar also contends that he moved the funds from FFI's Morgan Stanley account to the Charles Schwab account only because Morgan Stanley required him to call a live broker every time he made an options trade, whereas Charles Schwab allowed him to execute trades himself, thereby allowing him to "respond more quickly to changing market conditions." Dkt. # 21, at 13-14.

After transferring the assets to his personal account(s), Kumar continued to execute trades inconsistent with the represented investment strategy. Dkt. # 2, at 3. Specifically, between March 11, 2024 and March 14, 2024, Kumar used the transferred FFI funds to purchase 33,009 option contracts in Issuer A–a publicly traded crypto-asset technology company focused on Bitcoin mining–for approximately $5,845,040. Id. These trades resulted in a 98% loss of FFI's assets. Id.

On March 14, 2024, after realizing that he lost almost all of FFI's assets, which he had by now transferred to his personal account(s), Kumar emailed FFI's investors to inform them of the 98% drawdown. Id. at 13. However, Kumar lied about what caused the losses, claiming that the losses resulted from options trades in Index-Based ETF B and the failure of a stop-loss order to be entered. Id. As "proof" of this, Kumar attached to the email altered screenshots purporting to show trades in Index-Based ETF B, when in fact, Kumar had traded in Issuer A. Id. Kumar acknowledges that this was a "deliberate misrepresentation," stating that in a "panicked" state, he rationalized that

an index-fund position would seem "less idiotic than a concentrated single-stock options position." Dkt. # 21-2, at 7.

Just two months later, in May 2024, Kumar launched Arcane–a second investment fund that he owned through a separate entity which he also exclusively controlled and managed.[2] Dkt. # 2, at 14. Between May 2024 and February 2025, Kumar raised approximately $1.8 million for Arcane from ten investors. Id. at 4. Kumar solicited investors with additional false and misleading representations about Arcane's investment strategy, Arcane's returns, and the use of Arcane investor funds. For example, during May and June 2024, Kumar represented to investors in oral communications soliciting funds that the maximum risk of loss was 10 to 20% of Arcane's capital, while at least 80% of Arcane's assets would be held in cash. Id. at 14. In offering materials, including a private placement memorandum (PPM) and a pitch deck, Kumar detailed how Arcane would purportedly invest in crypto-based assets relying on Kumar's proprietary algorithm and that he had conducted over 100,000 simulations with each one of them demonstrating "zero cases of principal loss." Id. The offering materials also represented that the "[w]orst case expected return"

---

[2] Between losing all of FFI's funds and launching Arcane, Kumar worked with his former tennis coach and friend, Trent Tucker, on an investment recovery fund named Hail Mary, LLC (Hail Mary). Dkt. # 12, at 15. Tucker seeded Hail Mary with $1 million with the goal of "recovering the principal lost by FFI's members," which included Tucker. Id. at 16; Dkt. 21-18, at 2. FFI investors were given the option of exchanging their FFI interests for interests in Hail Mary, remaining in FFI under Kumar's continued management, or cashing out their remaining funds. Dkt. # 21, at 15. Six of FFI's investors accepted the offer to exchange their FFI interest for an interest in Hail Mary. Id. at 16. Hail Mary invested in cryptocurrency assets with significant upside potential and grew from the initial $1 million investment to $5,614,756.61 by December 31, 2024. Id. By that date, all of FFI's investors who swapped their FFI shares for Hail Mary shares were "made whole." Id. On January 3, 2025, Kumar informed these former FFI investors that their accounts were "above breakeven" and gave them the option to liquidate. Id. at 16-17. Ultimately, all of the Hail Mary investors elected to remain invested. Id. at 17. Kumar did not receive capital contributions or fees from Hail Mary. Id.

was 1.2x the value of the investment, which Kumar represented as a 17% gain on investment. Id. at 15. Additionally, Kumar represented to at least one investor that he had run another fund–presumably, FFI–which yielded a positive return of only between 30 and 40%. Id. However, by that point, Kumar had already lost virtually all of the remaining assets. Id.

The majority of Arcane investors sent their investments to an account in FFI's name. Id. Kumar explained to investors, through counsel, that he had not yet set up an account in Arcane's name, so as a temporary measure, he asked investors to wire their funds into the account under FFI's name. Dkt. # 21, at 19. Kumar used Arcane investor funds for unauthorized purposes, including a $300,000 payment to an FFI investor for losses the investor had previously sustained in FFI and a $20,000 payment made on November 4, 2024, to satisfy a debt that Kumar owed to an unrelated third-party. Dkt. # 2, at 15; Dkt. # 21-2, at 10. Kumar contends that the $300,000 payment to the FFI investor was actually for an over-the-counter swap that Kumar intended to acquire for Arcane to avoid transaction fees and price impact for crypto assets. Dkt. # 21, at 19-20. However, the SEC alleges that two days before the payment to the FFI investor, Kumar lied about the source of the funds, texting the investor that the funds came from trading in meme coins. Dkt. # 2, at 15.

Kumar provided Arcane investors with weekly updates on the profit-and-loss status of their investments. Id. After reporting a negative cumulative return of 22.17% the week of February 11, 2025, Kumar informed Arcane's investors that this loss was due to a "shift in strategy" that he made the week before to invest mostly in meme coins. Id. According to at least one investor, Kumar did not inform investors that he was going to change Arcane's strategy. Id. This investor called Kumar and then learned for the first time that Arcane might be at least 70% long in illiquid meme coins.

Id. The investor demanded that Kumar disclose what all of Arcane's investment were, but Kumar refused, responding that Arcane's exact holdings were confidential and proprietary. Id.

Kumar subsequently transferred Arcane's remaining assets of approximately $1.3 million into his personal bank account and then into his personal account at Coinbase, a crypto asset trading platform. Id. at 9. Kumar explains that he transferred the Arcane funds to his personal Coinbase account because, at that time, Coinbase did not provide business accounts, so he used his personal account to invest in crypto on behalf of Arcane. Dkt. # 21, at 19.

By March 2025, Arcane suffered losses of approximately 80%. Id. To date, Kumar has repaid FFI investors only $572,596, which includes the $300,000 payment to the FFI investor using Arcane funds. Dkt. # 12-1, at 8. Additionally, Kumar has repaid Arcane investors only $108,951. Id. In summary, Kumar raised approximately $7.8 million from investors for the Funds, transferred to his personal account(s) and subsequently lost approximately $6.9 million of the Funds' collective assets, and repaid a total of approximately $681,000 to the Funds' investors. Dkt. # 2, at 16. Kumar contends, based on an affidavit of Haley Legg, CPA, that a total of $1,160,397.89 was returned to the Funds' investors in four separate repayments. Dkt. # 21-7, at 6. However, the SEC's accountant could not find records to support two of the purported investor repayments identified by Legg. Dkt. # 29-1, at 5.

The SEC asks the Court to impose two third-tier civil penalties totaling $472,902 against Kumar. Dkt. # 12, at 22. Kumar argues that the civil penalty should not exceed $20,000. Dkt. # 21, at 34. As to disgorgement, the SEC argues that Kumar should be ordered to disgorge $6,298,614, representing the amount of the Funds' assets that Kumar misappropriated by transferring those assets from the Funds' bank and brokerage accounts, where investors sent their money to be invested in

the Funds, to Kumar's personal accounts, plus pre-judgment interest of $410,760. Dkt. # 12, at 17, 19. Kumar argues that the SEC's disgorgement calculation erroneously reflects Kumar's gross receipts, not net profits, and asks the Court to order a disgorgement award of only $20,000, representing the amount of investor funds Kumar misappropriated to satisfy a debt owed to a third-party. Dkt. # 21, at 23.

**II.**

The two issues before the Court are: (1) what amount, if any, Kumar should be required to pay in civil penalties, and (2) what amount, if any, Kumar should be required to disgorge and the amount of pre-judgment interest owed thereon.

The following provisions of the Exchange Act govern the application of civil penalties and disgorgement. In relevant part, 15 U.S.C. § 78u(d)(3) provides:

> (A) Authority of Commission.– . . . the Commission may bring an action in the United States district court to seek, and the court shall have jurisdiction to–
>
> (I) impose, upon a proper showing, a civil penalty to be paid by the person who committed such violation; and
>
> (ii) require disgorgement under paragraph (7) of any unjust enrichment by the person who received such unjust enrichment as a result of such violation.
>
> (B) Amount of Penalty.–
>
> (I) First tier.–The amount of a civil penalty imposed under subparagraph (A)(I) shall be determined by the court in light of the facts and circumstances. For each violation, the amount of the penalty shall not exceed the greater of (I) $5,000 for a natural person or $50,000 for any other person, or (II) the gross amount of pecuniary gain to such defendant as a result of the violation.
>
> (ii) Second tier.–Notwithstanding clause (I), the amount of a civil penalty imposed under subparagraph (A)(I) for each such violation shall not exceed the greater of (I) $50,000 for a natural person or $250,000 for any other person, or (II) the gross amount of pecuniary gain to such defendant as a result of the violation, if the violation described in subparagraph (A) involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement.
>
> (iii) Third tier.–Notwithstanding clauses (I) and (ii), the amount of a civil penalty imposed under subparagraph (A)(I) for each violation described in that subparagraph shall not exceed the greater of (I) $100,000 for a natural person or

> $500,000 for any other person, or (II) the gross amount of pecuniary gain to such defendant as a result of the violation, if–
>
> (aa) the violation described in subparagraph (A) involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and
>
> (bb) such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons.

15 U.S.C. § 78u(d)(5) provides that "[i]n any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."

15 U.S.C. § 78u(d)(7) provides that "[i]n any action or proceeding brought by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may order, disgorgement."

## III.

### A. Civil Penalties

The civil penalty provisions were enacted to further "the dual goals of punishment of the individual violator and deterrence of future violations." Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC, 467 F.3d 73, 81 (2d Cir. 2006). Whereas disgorgement "does not result in any actual economic penalty or act as a financial disincentive to engage in securities fraud," civil penalties are "necessary for the deterrence of securities laws violations." Id.

As the Tenth Circuit explained in SEC v. GenAudio Inc., 32 F.4th 902 (10th Cir. 2022), courts typically consider the following factors when imposing civil penalties under the securities laws:

> (1) the egregiousness of the violations at issue, (2) defendants' scienter, (3) the repeated nature of the violations, (4) defendants' failure to admit to their wrongdoing; (5) whether defendants' conduct created substantial losses or the risk of substantial losses to other persons; (6) defendants' lack of cooperation and honesty with authorities, if any; and (7) whether the penalty that would otherwise be appropriate should be reduced due to defendants' demonstrated current and future financial condition.

Id., at 954.

A civil penalty is authorized under 15 U.S.C. § 78u(d)(3), and the SEC asks the Court to impose two third-tier penalties totaling $472,902 against Kumar.[3] The Court will address each GenAudio factor in turn. The first factor–the egregiousness of the violations at issue–weighs against Kumar. Kumar lost a total of approximately $7.8 million in investor funds after misrepresenting his trading strategy, including which options Kumar would purchase, the maximum risk of loss of the Funds' capital, and expected returns. Kumar raised millions of dollars from his friends and personal connections who trusted his misrepresentations and relied on his impressive background, including his investment and private equity firm internships. As to FFI, Kumar made false representations to investors regarding its trading results, and misleading misrepresentations about its trading strategy. Due to these misrepresentations, Kumar was able to raise twelve new FFI investments totaling $4.7 million. Perhaps most egregious of all, Kumar lied to his FFI investors, going so far as to photoshop fake trades, in order to cover up that he lost virtually all of FFI's assets by placing trades that were inconsistent with the trading strategy he had represented. Then, just two months later, Kumar

[3] The statutory amounts for each tier of civil penalties are periodically adjusted for inflation as required by law. 17 C.F.R. § 201.1001(a). As adjusted for inflation, the maximum third tier fine for a natural person during the period of Kumar's misconduct is $236,451. SEC Release Nos. 33-11350; 34-102134; IA-6808; IC-35442, dated January 7, 2025 (effective Jan. 15, 2025), available at https://www.sec.gov/files/rules/other/2025/33-11350.pdf.

committed many of the same violations related the solicitation of funds for and management of Arcane, including by trading in illiquid meme coins contrary to the represented trading strategy. As investment adviser to the Funds, Kumar knowingly and repeatedly engaged in egregious securities fraud and breaches of his fiduciary duties that resulted in substantial investor losses, which he tried to cover up.

The SEC does not contend, and the Court does not find, that Kumar acted with an intent to steal his investors' funds. The Court agrees that Kumar likely "genuinely intended to run legitimate funds that returned profits to the investors." Dkt. # 21, at 36. However, Kumar still acted recklessly in soliciting investments and running FFI and Arcane. Perhaps Kumar's youth played a role in his "naïve overconfidence" (id.), resulting in him over promising and lying to cover up his mistakes, but despite his youth, his conduct was egregious.

Kumar argues that his conduct was not as egregious as defendant's conduct in SEC v. Fox, No. 11-CV-211-CVE-PJC, 2012 WL 5398791 (N.D. Okla. Nov. 2, 2012). In Fox, this Court found the defendant's conduct sufficiently egregious as to warrant the maximum statutory third-tier civil penalty, because the defendant misrepresented the nature of his investment in public filings and created a Ponzi scheme of paying existing obligations from new investments, which harmed the investors. Id. at *5. Kumar argues that his misconduct was limited to one year, not a multi-year fraud orchestrated from the executive suite of a public-reporting company. Dkt. # 12, at 35. He adds that he was a 19-year-old college student running his first investment fund, and he did not defraud the general public, file fraudulent reports with the SEC, or use investor funds for personal expenses aside from the $20,000 payment. Id. The Court is not persuaded by the argument that Kumar's conduct is not egregious because it is not the same as the misconduct in Fox. That Kumar was

successful in defrauding investors out of millions of dollars within a single year does not make his conduct any less egregious than if it had been a multi-year fraud. Kumar may not have defrauded the general public, but whether one defrauds the general public or approximately two dozen accredited investors, fraud is fraud nonetheless.

Kumar points to the operating agreements, which granted him the full discretion to control the Funds' assets. To Kumar, that the investors agreed to grant him full discretion absolves him from his wrongdoing in managing the Funds' assets. This argument be successful in a breach of contract claim. However, this is a case based on securities law violations. Under the terms of the consent agreement, Kumar acknowledges that he made several oral and written misrepresentations when raising money for the Funds and managing the same. Although some degree of risk was inherent, Kumar took several steps to unreasonably increase the risk, including continuously trading inconsistently with the marketed trading strategy. Kumar acknowledges that he lacked the experience to run the Funds, yet he continued to lose the investors' money until there was nothing left. Kumar states that he started FFI because he "wanted the chance to be entrusted with capital, to learn how to manage other people's money" (Dkt. #21-2, at 4), and perhaps that is why Kumar treated the investors' funds as monopoly money. Kumar admits that he knew he was in over his head (id.); yet, he did not stop and he did not communicate this to his investors.

To be sure, Kumar did not steal the Funds' money or use the Funds' money for personal expenses other than the $20,000 payment. However, Kumar owed the investors a fiduciary duty to invest the money, which was not his own, in accordance with the purpose for which the investors invested. Kumar did not seek out to lose all the money, but nevertheless did, and his conduct in doing so was egregious.

Kumar also points to his "hard work and dedication to making up for his investors' losses," referring to Kumar's efforts in Hail Mary (Dkt. # 21, at 35) to minimize the egregiousness of his violations. However, Kumar's actions subsequent to his misconduct do not diminish the egregiousness of his original misconduct. Kumar's efforts to recover FFI's investors' losses through Hail Mary are further minimized by his subsequent misrepresentations in soliciting funds for Arcane just a few months later. Accordingly, the Court finds that Kumar acted recklessly with regard to his fraudulent representations.

The third factor–the repeated nature of the violations–also weighs against Kumar. As discussed, just two months after losing all of FFI's assets, Kumar committed many of the same violations as the investment adviser for Arcane as he had with FFI by misrepresenting his trading strategy and the risk of loss to Arcane investors. Kumar argues that his violations are "isolated" and that he is not a "repeat offender" because his "most serious misrepresentations occurred over a short time period and involve isolated misrepresentations and a single improper use of investor funds." Kumar fails to appreciate that his misrepresentations cannot be viewed as "isolated" in light of the fact that, after causing significant losses for FFI investors, he launched Arcane and repeated the same misconduct that underscores his violations as investment adviser to FFI. Kumar's argument also fails because he did not engage in merely "a single" improper use of investor funds; each time that he traded contrary to the represented investment strategy, including when he bought a concentrated single-stock options position in Issuer A and illiquid meme coins, he undoubtedly misused investor funds.

As to the fourth factor, Kumar has accepted responsibility for his wrongdoing to a certain extent. He recognizes that he misrepresented the cause of the 98% loss in FFI and that he

misappropriated $20,000 of investor funds for a personal expense. However, Kumar attempts to limit the scope of his violations by challenging several facts as alleged in the complaint, including his material misrepresentations in soliciting investors, his unlawful transfers of the Funds' assets to his personal accounts and failure to disclose the same to investors, his misuse of $300,000 of Arcane funds to repay a FFI investor, and the total losses he caused as a result of trading outside the strategy represented to investors. It is especially concerning to the Court that Kumar maintains that "aside from the $20,000 payment . . . , the losses were the result of broader market declines, not Mr. Kumar's violations" and that "many of Mr. Kumar's misrepresentations were made after the losses occurred." Dkt. # 21, at 39. Kumar minimizes his false and misleading misrepresentations by merely admitting that he "projected optimism" to investors, but he argues that he provided written disclosures, nullifying any prior oral or written statements, before accepting investments. This demonstrates that Kumar does not appreciate, or is choosing not to, the extent of his wrongdoing. This Court found Kumar violated the securities laws and entered a judgment against him. As such, Kumar cannot now attempt to contest liability through statements veiled as challenges against an order for civil penalties and disgorgement. Although it may be true that some of the Funds' losses were the result of market declines, Kumar's violations of the securities laws did not arise from market declines. Instead, his violations arise from the misrepresentations he made while soliciting investor funds and managing FFI and Arcane. For these reasons, the Court finds that Kumar has not accepted responsibility for the full scope of his violations.

It is undisputed that Kumar's conduct created substantial losses to his investors. Kumar's fraudulent representations resulted in the loss of $7.8 million, affecting approximately two dozen

investors. Accordingly, the fifth factor–whether defendants' conduct created substantial losses or the risk of substantial losses to other persons–weighs against Kumar.

Kumar cooperated with the SEC's investigation by providing documents promptly and without objection after receiving the SEC's subpoenas, and sitting for a deposition with the SEC. Kumar also agreed to the entry of a consent judgment in this case. For these reasons, the sixth factor–defendants' lack of cooperation and honesty with authorities–weighs in Kumar's favor.

Finally, the Court recognizes that Kumar had a $335.29 net worth as of June 8, 2026. Dkt. # 21-7, at 10. Kumar attests that he is currently unemployed. Dkt. # 21-2, at 14. Although the press coverage of this case has likely hindered Kumar's employment search, Kumar did receive an internship at American Power Innovations ("API") through a recommendation by Steve Mitchell, CEO of Argonaut Private Equity, who identifies as a mentor to Kumar. Dkt. # 21-26, at 3. It is not clear from the record whether Kumar's internship with API was paid or unpaid. Regardless of Kumar's current unemployment, his financial condition is likely to improve in the future. Kumar holds a finance degree (Dkt. # 21, at 39) and still maintains several relationships with professionals in the financial sector, including Mr. Tucker, Mr. Mitchell, Mr. Gray, and at least four FFI investors who submitted letters on his behalf (Dkt. # 21-10; Dkt. # 21-11; Dkt. # 21-12; Dkt. # 21-13). Although Kumar does not have the funds to pay any civil penalty at present, his financial condition will likely improve.

In sum, most of the GenAudio factors weigh against Kumar. Accordingly, the Court will impose two third-tier civil penalties for a natural person totaling $472,902 (or $236,451 per Fund)

against Kumar.[4] The Court imposes two third-tier penalties based on the two Funds for which Kumar acted as an investment adviser when he violated the federal securities laws, as the statute authorizes a civil penalty for "each violation" involving "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" resulting in "substantial losses." 15 U.S.C. § 78u(d)(3).

**B. Disgorgement**

The Supreme Court has affirmed a court's power to award disgorgement in an SEC enforcement action pursuant to 15 U.S.C. § 78u(d)(5), which authorizes courts to grant "any equitable relief that may be appropriate or necessary for the benefit of investors." Liu v. SEC, 591 U.S. 71, 75 (2020) . In Liu, the Court explained that any such remedy under § 78u(d)(5) must fall into "those categories of relief that were typically available in equity." Id. at 79.

The equity courts routinely deprived wrongdoers of their net profits from unlawful activity, although that remedy was referred to by different names, including accounting, restitution, and disgorgement. Id. "Whatever the name," a remedy tethered to a wrongdoer's net unlawful profits has been a "mainstay" of equity courts. Id. at 80. The equity courts circumscribed profits remedies to avoid transforming the award into a penalty outside their equitable powers. Id. at 82; see also Marshall v. Vicksburg, 15 Wall. 146, 149, 21 L.Ed. 121 (1873) ("Equity never . . . lends its aid to enforce a . . . penalty.").

"Restitution" means "an act of restoring or a condition of being restored," such as "a restoration of something to its rightful owner" or "a making good of or giving an equivalent for some

---

[4] See note 3, supra.

injury." Restitution, Merriam-Webster, https://www.merriam-webster.com/dictionary/restitution (last visited Sept. 23, 2026). In this manner, restitution seeks to make a victim whole by restoring the status quo. By contrast, "disgorgement" means the "act of giving up something (such as profits illegally obtained) on demand or by legal compulsion." Sripetch v. SEC, 608 U.S. 555, 570 (2026) (Thomas, J., dissenting) (quoting Disgorgement, Black's Law Dictionary 588 (12th ed. 2024)). As opposed to restitution, disgorgement looks to the wrongdoer's gain, not the victim's loss. Id. at 565.

There is disagreement over whether disgorgement was typically available in the English Court of Chancery and, therefore, available as a form of equitable relief under § 78u(d)(5). Liu, 591 U.S. at 93 (Thomas, J., dissenting). The Supreme Court has acknowledged the "relatively recent vintage of the term 'disgorgement.'" Id. at 76 n.1 (majority opinion). Disgorgement as an equitable remedy did not appear in any published cases until the 20th century. Id. at 94 (Thomas, J., dissenting). In the 1960s, disgorgement was used to refer to a remedy in the administrative context and by the 1970s, courts started using the term to describe a judicial remedy in its own right. Id. at 95-96. When the SEC initially sought this kind of relief under the Securities Exchange Act in SEC v. Texas Gulf Sulphur Co., 312 F. Supp. 77 (S.D.N.Y. 1970), the district court called it "restitution," and the court of appeals called it "[r]estitution of [p]rofits," which amounted to "profits" that "merely depriv[e]" a defendant of the "the gains of . . . wrongful conduct." Liu, 591 U.S. at 75, 96 (quoting Texas Gulf Sulphur, 312 F. Supp. at 1308). Thereafter, courts substituted "restitution of profits" for the label "disgorgement." Id. at 96 (Thomas, J., dissenting) (citing SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1105 (2d Cir.1972); SEC v. Shapiro, 349 F. Supp. 46, 55 (S.D.N.Y. 1972)).

The majority in Liu rejected the argument that the recency in the use of the term "disgorgement" removes disgorgement from the class of traditional equitable remedies, given disgorgement's parallels to "restitution-based awards." Liu, 591 U.S. at 76 n.1. The Court acknowledged the "protean character" of disgorgement arising from the Court's previous varied treatment of disgorgement, describing disgorgement as a "limited form of penalty," comparing disgorgement to restitution that merely restore the status quo and to an "accounting for profits," and ordering disgorgement in a "basically equitable" original jurisdiction proceeding." Id. at 80-81.

In 2002, Congress amended the Exchange Act to enact § 78u(d)(5), allowing the SEC to seek "any equitable relief that may be appropriate or necessary for the benefit of investors." Sripetch, 608 U.S. at 1407. In Liu, the Court held that "equitable relief" can encompass a disgorgement remedy; however, "equitable relief" does not capture the kind of disgorgement awards the SEC had often sought and obtained in lower courts, which exceeded a defendant's profits resulting from his violation. Sripetch, at 1407. Accordingly, in Liu, the Court identified a key limitation on disgorgement awards–disgorgement must be "limited to the defendant's net profits (not total revenues) derived from his securities-law violations," because equity seeks to deprive wrongdoers of their profits from unlawful activity. Id. The Court explained that "net profits" from wrongdoing is "the gain made upon any business or investment, when both the receipts and payments are taken into the account." Liu, 591 U.S. at 83. As such, the Court set forth an important principle that "courts must deduct legitimate expenses" when ordering disgorgement. Id. at 91.

Shortly after Liu, Congress amended the Exchange Act to add disgorgement to the SEC's list of enforcement tools under § 78u(d)(7) and that the SEC may seek "disgorgement under paragraph (7) of any unjust enrichment by the person who received such unjust enrichment as a result of his

securities-law violation." § 78u(d)(3)(A)(ii). Since these developments, the Supreme Court has declined to answer whether disgorgement under § 78u(d)(7) remains an equitable remedy subject to traditional equitable rules. Sripetch, 608 U.S. at 564.

Although disgorgement per se may not have been known to the courts of chancery, a "profit-based measure of unjust enrichment" that is "tethered to a wrongdoer's net unlawful profits" has been a "mainstay" of equity courts. Liu, 591 U.S. at 79-80. Therefore, this Court will look to whether Kumar personally profited or gained by his wrongful activities as outlined above.

Here, the SEC seeks a disgorgement order of $6,298,614, representing the amount of investor funds that the SEC alleges Kumar misappropriated by transferring the funds to his personal accounts minus repayments Kumar has made to the Funds' investors.[5] The SEC argues that this amount represents the "net profits" Kumar received in his personal accounts. Dkt. # 12, at 17.

However, except for the $20,000 payment to a third-party for a personal debt reduction, Kumar received no net profits from his securities laws violations. The Supreme Court used the term "net profits" to refer to a defendant's wrongful gains. Liu, 591 U.S. at 92. In Liu, the lower court had ordered disgorgement equal to the full amount the defendants–Charles Liu and his wife, Lisa Wang–raised from investors, less the amount that remained in the corporate accounts. Id. at 78. Liu and Wang solicited nearly $27 million from foreign investors for a fraudulent scheme under the EB-5 Immigrant Investor Program (EB-5 program). Id. at 77. Liu sent a private offering memorandum to prospective investors, pledging that funds would be contributed toward the construction of a cancer-treatment center and only a small administrative fee would be collected to fund legal,

---

[5] The SEC subtracted only the two payments to investors that the SEC accountant was able to identify. Dkt. # 29-1, at 5.

accounting, and administration expenses. Id. However, Liu and Wang misappropriated the majority of investor funds–nearly $20 million–by paying for alleged marketing expenses and salaries far in excess of what the offering memorandum permitted and diverting funds to personal accounts and to a company under Wang's control. Id. Still, a fraction of the investor funds were in fact put toward a lease, property improvements, and a proton-therapy machine for cancer treatment, as was the aim of the EB-5 Program. Id. at 77-78. Vacating the judgment, the Court left it to the lower court to determine on remand whether these funds that were seemingly used for the purpose of the EB-5 program should be deducted from the disgorgement award. Id. at 92-93.

On remand, the district court ordered a disgorgement award of approximately $20 million, which represented the nearly $27 million that Liu and Wang raised from investors less administrative expenses, legitimate business expenses (including the lease payments and equipment costs), and the small sums remaining in the corporate accounts. SEC v. Liu, 2021 WL 2374248, at *10 (C.D. Cal. June 07, 2021). The Ninth Circuit affirmed, rejecting the defendants' argument that "there were no revenues and no profit, . . . thus no disgorgement," as there were no profits because "the defendants stole the investment capital necessary to build the cancer treatment facility." SEC v. Liu, 2022 WL 3645063, at *2 (9th Cir. Aug. 24, 2022).

Kumar did not steal anywhere near six million dollars of investor funds for his personal benefit. The driving principle behind a disgorgement award is that it would be inequitable for a wrongdoer to gain from his own wrong. Liu, 2022 WL 3645063, at *2. Here, Kumar did not gain from his wrongdoing. Kumar did not pay himself a salary or take unauthorized management fees. Kumar did not divert investor funds to companies he was connected with, like the defendants in Liu.

With the exception of the $20,000 payment to a third-party for a personal purpose unrelated to the Funds, Kumar did not buy himself homes, planes, cars, or other assets using investor funds.

Although Kumar made false representations about his trading strategy and guaranteed returns, Kumar used the funds solely for investment purposes, save for the $20,000 payment. Kumar's misrepresentations do not transform the investor funds into his personal, ill-gotten gains for purposes of disgorgement. Kumar managed–albeit, poorly–the Funds' assets for purposes of creating returns for the investors, which must constitute "value independent of fueling a fraudulent scheme." Liu, 591 U.S. at 92.

The SEC places great weight on the fact that Kumar transferred the assets from the Funds' account(s) to his personal account(s). Putting aside the issue of whether Kumar intended to open a personal or business account at Charles Schwab, the mere transfer of the investor funds from FFI's Morgan Stanley account to the Charles Schwab account in Kumar's name is not sufficient to conclude that the transferred funds constitute Kumar's net profits. For purposes of disgorgement, the issue is not in which account the funds were held but, rather, whether Kumar wrongfully gained from his misconduct. Kumar did not wrongfully gain because he did not misappropriate the investor funds for illegitimate, personal purposes. Unlike in Liu, where the marketing expenses and salaries went beyond what the offering memorandum permitted, here, the operating agreements granted Kumar discretion to trade. Kumar wrongly transferred the funds to his personal accounts. However, having done so, he used the funds to invest as investment adviser to the Funds.

The SEC argues that the disgorgement award should not be reduced merely because Kumar has "dissipated" or "spent" the funds. Dkt. # 12, at 18. It is true that a defendant who dissipates investor funds by diverting unauthorized payments to third parties, using the funds for personal

expenses or excessive "salary" payments, or making fraudulent payments with the funds for nonexistent services or products will still be liable to disgorge such dissipated funds. See Liu, 591 U.S. at 77 (misappropriated funds spent on unauthorized payments to third-parties and exorbitant salaries); SEC v. Camarco, 2021 WL 5985058, at *2 (10th Cir. Dec. 16, 2021) (misappropriated investor funds spent on car loan, credit card bill payments, and airline tickets); SEC v. Penn, 2021 WL 1226978, at *11 (S.D.N.Y. Aug. 22, 2017) (misappropriated funds used to pay falsified invoices for third-party services that had not been performed). Kumar did not dissipate the funds in such manner, except for the $20,000 payment to a third-party. Kumar dissipated the funds in the course of acting as the investment adviser to the Funds. Although Kumar violated the securities laws in recruiting investors and managing the Funds, he was not running a fraudulent scheme for purposes of stealing investor funds for his personal benefit as Liu and Wang did.

The SEC seeks to transform disgorgement into restitution by seeking a disgorgement award of over $6 million, which encompasses a majority of what the investors lost. Although the investors lost a substantial sum, the SEC cannot seek restitution under the guise of a disgorgement award. Whereas restitution looks to the victim's losses, disgorgement looks only to the wrongdoer's gain. Here, Kumar's gain was limited. Similarly, the Court refuses to transform the disgorgement award into a punishment by ordering him to pay beyond his ill-gotten gains. The Court has already addressed the civil penalties, and Kumar has been punished accordingly.

For these reasons, the Court orders Kumar to disgorge $20,000, representing his net profits, or ill-gotten gains, from the Funds. This Court ordered that Kumar must pay pre-judgment interest on any disgorgement award. Pre-judgment interest began accruing as of the day that Kumar made the $20,000 payment. The bifurcated judgment provides that pre-judgment interest "shall be

calculated based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2)." Dkt. # 9, at 6. As explained above, the Court grants the remedies the SEC requests, except the disgorgement award is limited to the $20,000 amount the SEC has shown to be Kumar's profits.

**IT IS THEREFORE ORDERED** that the SEC's motion for remedies and entry of final judgment (Dkt. # 12) is **granted in part** and **denied in part**. An omnibus final judgment, including the terms of the earlier consent judgment (Dkt. # 9) and the rulings herein, will be entered for plaintiff and against defendant in the amount of $472,902 in civil penalties; $20,000 in disgorgement, plus pre-judgment interest on the disgorgement amount only to be calculated pursuant to 17 C.F.R. § 201.600 (2025); plus post-judgment interest thereon at the rate the Court will insert in the final judgment.

**IT IS FURTHER ORDERED** that plaintiff's counsel shall submit the proposed omnibus final judgment, approved as to form only, by **October 8, 2026**, through the CM/ECF intake box as a proposed judgment in Word or WordPerfect format.

**DATED** this 1st day of October, 2026.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE